IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Z. T., by and through her parent GINA HUNTER, and GINA HUNTER,

Plaintiffs,

v.

SANTA ROSA CITY SCHOOLS, DIANN KITAMURA, SOCORRO SHIELS, TIM ZALUNARDO, ANDREA CORREIA, RYAN THOMPSON, ANJULI HOLLMAN, TRISH DELZELL, MORGAN MARCHBANKS, and DOES 1–25,

Defendants.

No. C 17-01452 WHA

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

**INTRODUCTION**

In this action for civil rights violations, defendants move to dismiss. The motion is **GRANTED IN PART** and **DENIED IN PART**. Although this order dismisses certain claims for relief asserted in the complaint, the action will go forward on plaintiffs' remaining claims.

**STATEMENT**

This is an action by plaintiffs Z. T., a minor, and her mother Gina Hunter against defendants Santa Rosa City Schools ("the district") and various school staff — discussed individually below within the context of plaintiffs' allegations — under a surfeit of legal theories. The following is taken from the well-pled allegations of the complaint (Dkt. No. 1).

Z. T., a Caucasian female student who identifies as bisexual, has attended schools in the district from kindergarten through twelfth grade (*id.* ¶¶ 3–4, 16). For most of that time, she has been under the care of a counselor or psychologist for "emotional instability" as a result of alleged sexual abuse by her father when she was six or seven years old (*id.* ¶¶ 16–17). When she began the 2015–2016 school year at Piner High School, Z. T.'s school file reflected her ongoing mental health treatment. Moreover, Z. T. at some point had told defendant Andrea Correia, a vice principal at Piner, about the alleged sexual abuse (*id.* ¶¶ 17–18). At the beginning of the 2015–2016 school year, Z. T. had been elected student body president in her Associated Student Body ("ASB") class and played as a starting guard on the girls' varsity basketball team (*id.* ¶ 18).

Between September 28 and October 29 of 2015, Z. T. complained that a student in her ASB class had "sexually harassed her by groping her buttocks, overtly staring at her breasts, and making inappropriate sexual comments. On October 29, [Correia] was made aware of Z. T.'s complaints" (*id.* ¶ 19). On November 10, Z. T. "wrote a letter of complaint about the manner in which [defendant Anjuli Hollman, a teacher at Piner,] was supervising and advising the ASB class" (*id.* ¶ 20). Around the same time, Z. T. "assisted a fellow female classmate who had been sexually assaulted by a Latino student. Z. T.'s assistance made her a witness in a pending federal lawsuit alleging negligence and a hostile environment at Piner" (*id.* ¶ 21).

On November 13, Z. T. met with Correia and complained about the latter's inaction on her November 10 complaint letter regarding Hollman. Correia responded that "she would not allow Z. T. to 'bad mouth' Piner staff" and that "there were multiple disciplinary referrals pending against Z. T. Prior to this conversation, Z. T. had not been informed she was the subject of any disciplinary referrals." Z. T. asked to see documentation of the referrals, but Correia refused. Correia also advised Z. T. that "she had better step down as student body president," or "she would prevent Z. T. from playing basketball." Z. T. asked to have her mother present for the decision, but Correia refused. Severely agitated and not allowed to talk to her mother, Z. T. then resigned as student body president (*id.* ¶¶ 22–23).

After Z. T.'s resignation, Correia unilaterally moved her from the ASB class into a non-academic pass/fail course. Additionally, Hollman misreported Z. T.'s grades, rendering her ineligible to play varsity basketball. Defendant Trish Delzell, a teacher and athletic director at Piner, informed Z. T. of her ineligibility "one minute before the start of her first league game" and "in front of her teammates, family and school." Z. T.'s mother eventually sent a written complaint to the district office, which caused "an immediate correction to Z. T.'s records and reinstatement of her eligibility to play." Afterwards, however, Delzell warned Z. T. that she had "better not go over her head again" (*id.* ¶ 23).

Also in November 2015, seven "non-Caucasian," apparently Latina female students at Piner began bullying Z. T. (*see id.* ¶¶ 24, 36). The complaint alleges without elaboration that these Latina students "maintained a very close relationship with Correia" (*id.* ¶ 36). At unspecified times, "Z. T. filed multiple complaints with administrators at Piner regarding the harassment and bullying" (*id.* ¶ 29). On an unspecified date, another student reported — the complaint does not say to whom — that she was afraid Z. T. would be "jumped." In response, Piner's administration "usher[ed] Z. T. off campus" (*id.* ¶ 25).

On another unspecified date, Z. T. learned of another threat and went to the school office. On the way there, "she was followed by the gang of bullies who were yelling obscenities, peppering her with questions about her sexual orientation, and threatening physical harm" (*id.* ¶ 26). At the office, Correia and defendant Ryan Thompson, an assistant principal at Piner, held an "impromptu intervention" and forced Z. T. to face "five of the female bullies, one male Latino bully . . . and one witness, J. S." The intervention failed. Correia and Thompson left the office, with Thompson yelling, "this was a complete waste of time." Z. T. then "ran from the room pursued by her attackers who were only stopped from reaching [her] when [her] mother . . . arrived on campus" (*id.* ¶ 27).

In February 2016, the bullying intensified after Z. T. broke up with S. L., her African-American girlfriend. The bullying included verbal and physical threats. For example, the "gang of girls" called Z. T. "stupid white bitch," "stupid white girl," and "pussy." They also "followed her around school, waited outside of her classrooms, glared at her, and made

3

disparaging remarks about her sexual orientation" (*id.* ¶ 24). On one occasion in February 2016, S. L., Z. T.'s ex-girlfriend, "attempted to physically attack Z. T. in the classroom" and "had to be restrained by a teacher who grabbed her by her backpack" (*id.* ¶ 30). On February 25, defendant Morgan Marchbanks, a teacher at Piner, allowed S. L. to give a presentation to the class "during which she disparaged Z. T. and disclosed intimate details of their prior relationship." Z. T. complained to Thompson. Z. T. was disciplined as a result (*id.* ¶ 31). Z. T. reported "further harassment by S. L." on March 7 and 8 — again, the complaint does not say to whom — and was again disciplined as a result (*id.* ¶ 32).

On March 16, Z. T. told Correia that "S. L. and other bullies had made further racial slurs and threatened her physically." Z. T.'s mother then visited the school and asked that Z. T. be transferred to an Independent Study Program (*id.* ¶ 33). The complaint does not say what, if anything, came of that request. The next day, Correia confronted Z. T. and Z. T.'s witness, J. S., when they arrived at Piner. Correia said "they had been suspended and should not be on campus." Z. T. asked for the basis of the suspension, but Correia refused to explain. "Z. T. and J. S. got into a heated conversation with Correia," after which Correia claimed "that Z. T. threatened physical harm to both S. L. and school personnel." As a result, on March 28, Piner administrators recommended that Z. T. be expelled (*id.* ¶ 34).

Z. T. was apparently excluded from Piner pending a hearing on her recommended expulsion (*see id.* ¶ 37). In the meantime, the district "agreed to supply homework packets" but "would frequently fail to have packets that were complete or ready for pick-up." Additionally, the homework packets "generally lacked any instruction." The district "initially agreed to provide a tutor [but] reneged on its promise" (*id.* ¶ 38).

On May 18 (ostensibly still in 2016, though the complaint says 2017), one of the students who had bullied Z. T. posted a video on social media with "multiple threats and taunts as well as racial slurs" and a threat to Z. T. and her mother's lives. Z. T. and her mother reported the threat to Thompson and defendant Tim Zalunardo, the principal at Piner. As far as plaintiffs know, the student responsible for the video was never disciplined for it (*id.* ¶ 35).

On May 24, Piner held an expulsion hearing for Z. T. The hearing "concluded with a unanimous decision to drop all charges against [her] and allow her to return to [school]." By then, however, "there was only one week of school left before the summer break" (*id.* ¶ 37).

To try to make up for missed school time, Z. T. attended summer school at Santa Rosa High School. She discovered, however, that two of the students who had bullied her attended the same program. Z. T. alerted the program administrator, who responded by dropping Z. T. from her English class and "advising her to spend her lunchtimes indoors" (*id.* ¶ 39).

In August 2016, Z. T. transferred to Maria Carrillo High School and joined the girls' varsity basketball team there. In November, someone — due to a typographical error in the complaint, it is unclear who — apparently called Z. T.'s new coach and "talked disparagingly . . . about Z. T.," thereby causing her unspecified "problems" (*id.* ¶ 40). On December 1, Z. T. played for her new team at a game against Piner. S. L. attended the game. Shortly after the game, someone reported to Maria Carillo's administration that "Z. T. had sexually harassed S. L. by grabbing her buttocks as S. L. walked past the Maria Carillo bench." Maria Carillo's administration "conducted a month-long investigation into the incident" and "conclud[ed] that the claim was unsubstantiated" (*id.* ¶ 41).

Based on the foregoing allegations, plaintiffs assert claims for relief for discrimination and retaliation in violation of Title VI of the Civil Rights Act of 1964, sexual harassment and retaliation in violation of Title IX of the Education Amendments of 1972, deprivation of the right to equal protection and retaliation in violation of Section 1983 of Title 42 of the United States Code, violation of the Individuals with Disabilities Education Act of 2004, violation of Section 220 of the California Education Code, violation of California's Unruh Civil Rights Act, and intentional and negligent infliction of emotional distress.

Defendants move to dismiss plaintiffs' IDEA and Unruh Act claims (Dkt. Nos. 11, 17). This order follows full briefing and oral argument.

**ANALYSIS**

**1.    LEGAL STANDARDS.**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a motion to dismiss, a court may generally consider only allegations in the pleadings, attached exhibits, and matters properly subject to judicial notice. The court accepts well-pled factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008). Conclusory allegations or "formulaic recitation of the elements" of a claim, however, are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681.

As a preliminary matter, this order notes that the scope of defendants' motion to dismiss has narrowed significantly since their moving papers. Initially, defendants sought to dismiss (1) all claims against the district based on Eleventh Amendment immunity, (2) the Title IX claims as unauthorized against the individual defendants, (3) the IDEA claim as unauthorized against the individual defendants and barred in any event because plaintiffs have not exhausted their administrative remedies, and (4) the Unruh Act claim because defendants did not operate a "business establishment" (Dkt. No. 11).

In their opposition, plaintiffs conceded that "claims under Title IX do not apply to individuals" (Dkt. No. 15 at 2). Plaintiffs also did not dispute that they have no IDEA claim against the individual defendants (*see id.* at 6–8). Their Title IX and IDEA claims against the individual defendants are therefore **DISMISSED**. Leave to amend is denied as futile.

In their reply, defendants withdrew their assertion of Eleventh Amendment immunity (Dkt. No. 17 at 1). The only issues remaining on this motion are defendants' arguments that (1) the IDEA claim against the district is barred because plaintiffs have not exhausted their

administrative remedies, and (2) the Unruh Act claim must be dismissed because defendants did not operate a "business establishment." This order addresses each in turn.

**2. IDEA CLAIM.**

Plaintiffs' IDEA claim is predicated on the "child find" provision set forth at Section 1412(a)(3) of Title 20 of the United States Code. That provision states in relevant part:

> A State is eligible for assistance under this subchapter for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets each of the following conditions:
>
> . . .
>
> All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

Based on the foregoing, plaintiffs assert that defendants "were aware that Z. T. suffered from emotional instability, was prone to outbursts, and had been undergoing private counseling," yet never evaluated her or determined "whether [she] was entitled to receive special education or related services." As a result, she "suffered special and general damages, including temporary and permanent academic disruption, stigmatization, loss of social companions and typical social opportunities, scorn, embarrassment, humiliation, exacerbation to her psychological condition, and lost education opportunities" (Dkt. No. 1 ¶¶ 73–75).

IDEA's exhaustion requirement is set forth at Section 1415(*l*) of Title 20 of the United States Code, which provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.*

7

20 U.S.C. 1415(*l*) (emphasis added). Plaintiffs do not dispute that their "child find" claim is subject to IDEA's exhaustion requirement. Nor do they deny that they have made no attempt to pursue administrative remedies under IDEA. Instead, they contend they are exempt from the requirement because (1) they seek only monetary damages and (2) the administrative process would be "futile or inadequate" (Dkt. No. 15 at 7–8). Both contentions are unpersuasive.

*First*, as plaintiffs recognize, "monetary damages [are] ordinarily unavailable under the IDEA." *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 873 (9th Cir. 2011), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (citations omitted). Thus, under Section 1415(*l*), "*[n]on–IDEA* claims that do not seek relief available under the IDEA are not subject to the exhaustion requirement." *Id.* at 871 (emphasis added). As our court of appeals has explained, "[i]f a plaintiff does *not* seek relief based on an IDEA right, and does not seek a remedy provided by the IDEA, then she is not bound by the IDEA's prerequisites for litigation." *Id.* at 879 (emphasis added). "If a plaintiff can identify a school district's violation of federal laws *other than the IDEA* and can point to an authorized remedy for that violation unavailable under the IDEA, then there is no reason to require exhaustion." *Id.* at 881 (emphasis added).

That is not our case. Here, plaintiffs' IDEA claim indisputably arises out of and seeks relief for the district's alleged violation of IDEA's "child find" requirement. Plaintiffs cannot evade the exhaustion requirement for that claim simply by seeking an improper form of relief. "[W]here the claim arises only as a result of a denial of a [free appropriate public education], whether under the IDEA or the Rehabilitation Act, exhaustion is clearly required." *Id.* at 880. Thus, in *Payne*, our court of appeals concluded "[the plaintiff's] claim that the defendants violated [a student's] statutory rights under the IDEA [was] plainly barred by [Section] 1415(*l*) because any relief that [the plaintiff] could obtain for violations of the IDEA is relief that is also available under [the IDEA] itself." *Id.* at 883 (quotations omitted). So too here.

*Second*, plaintiffs have not shown that the administrative process would be futile or inadequate here. *See Doe By and Through Brockhuis v. Ariz. Dept. of Educ.*, 111 F.3d 678, 681 (9th Cir. 1997) ("The party alleging futility or inadequacy of IDEA procedures bears the burden of proof."). They assert that "the combination of their well-founded position and the

Defendant's actions constituting violations of IDEA, render it unlikely that adequate relief could have been obtained through the administrative process" (Dkt. No. 15 at 7). This assertion is unpersuasive. Section 1415(*l*)'s exhaustion requirement would be a nullity if a plaintiff proceeding under IDEA could prove the futility or inadequacy of its administrative procedures simply by alleging that a defendant violated its provisions.

Plaintiffs also claim they "made attempts to seek administrative assistance and solutions" but "any further exhaustion would have served no useful purpose because all administrative officers repeatedly responded with indifference, inaction, insufficient action and even retaliation" (*id.* at 7–8). True, the complaint alleges that plaintiffs made several complaints to various school administrators about Z. T.'s troubles — albeit, strangely, without important details like the dates or specific contents of certain complaints, which specific administrator they were directed to, whether they were formal or informal in nature, and what, if anything, came of them. But nowhere in either the complaint or their opposition to the instant motion do plaintiffs allege they made any effort to actually invoke any of the extensive administrative procedures provided by IDEA. This, too, falls well short of proving futility or inadequacy and cannot excuse plaintiffs' failure to exhaust here.

In short, plaintiffs have failed to satisfy the exhaustion requirement applicable to their IDEA claim. This claim is therefore **DISMISSED**. Leave to amend is denied as futile.

### 3. UNRUH ACT CLAIM.

Section 51(b) of the California Civil Code provides (emphasis added):

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever.*

The parties dispute only whether public schools constitute "business establishments" within the meaning of the statute. The California Supreme Court and courts of appeal have not yet directly addressed this issue. Nor have the Supreme Court and our court of appeals. Every California district court decision to reach the question has answered it in the affirmative, frequently

referencing the California Supreme Court's admonition that the Unruh Act be interpreted "in the broadest sense reasonably possible." *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 76 (1985); *see, e.g.*, *K. T. v. Pittsburg Unified Sch. Dist.*, 219 F. Supp. 3d 970, 983 (N.D. Cal. 2016) (Judge Charles Breyer); *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1123 (E.D. Cal. 2011) (Judge Lawrence O'Neill); *Nicole M. By and Through Jacqueline M. v. Martinez Unified Sch. Dist.*, 964 F. Supp. 1369, 1388 (N.D. Cal. 1997) (Judge Marilyn Patel); *Doe By and Through Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1581–82 (N.D. Cal. 1993) (Judge Eugene Lynch); *Sullivan By and Through Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 952–53 (E.D. Cal. 1990) (Chief Judge Lawrence Karlton).

Against the weight of the foregoing authority, defendants proffer *Doe v. California Lutheran High School Association*, 170 Cal. App. 4th 828 (2009), and *Curran v. Mount Diablo Council of the Boy Scouts*, 17 Cal. 4th 670 (1998). They point out that both decisions antedate *Nicole M.* and *Sullivan*, the only two decisions cited by plaintiffs for the proposition that public schools constitute "business establishments" (*see* Dkt. Nos. 15 at 9, 17 at 3–4).

*First*, as explained, the unanimous consensus within the California district courts on this point actually remains current and in plaintiffs' favor. As even the few examples cited above show, the body of case law on this subject extends well beyond what counsel for either side bothered to mention. Thus, contrary to defendants, the ages of *California Lutheran* and *Curran* relative only to *Nicole M.* and *Sullivan* are of no moment.

*Second*, neither *California Lutheran* nor *Curran* even addressed the issue of public schools within the context of the Unruh Act. Rather, they considered the applicability of the statute to a private religious school and to the Boy Scouts — described as a "charitable, expressive, and social organization . . . whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members" — respectively. Defendants do not contend that the district even remotely fits either description. Thus, contrary to defendants, *California Lutheran* and *Curran* do not "constitute better evidence of how the California Supreme Court would today resolve the question [of] whether public schools constitute business establishments under the Unruh Act" (*see* Dkt. No. 17 at 4).

10

This order agrees with the consensus of other California district court decisions that public schools constitute "business establishments" within the meaning of the Unruh Act. On the instant motion, defendants have not shown any reason why the statute would not apply to them here. Their motion to dismiss as to plaintiffs' Unruh Act claim is therefore **DENIED**.

## CONCLUSION

To the extent stated herein, defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. For the reasons stated herein, leave to amend is denied as futile.

**IT IS SO ORDERED.**

Dated: October 5, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE